Ines RIVERA, Jesus Rivera, Sr., Jesus Rivera, Jr., Emma Rivera, Hector Rivera, Ruben Hernandez and Elida Hernandez, Plaintiffs-Appellees,

v.

ADAMS PACKING ASSOCIATION, INC., a Florida corporation, Defendant-Appellant.

No. 82–5016.

United States Court of Appeals, Eleventh Circuit.

June 23, 1983.

Allen M. Blake, Tampa, Fla., for defendant-appellant.

David Rubman, Florida Rural Legal Services, Inc., Bartow, Fla., for plaintiffs-appellees.

Before GODBOLD, Chief Judge, RONEY, Circuit Judge, and PITTMAN *, District Judge.

PITTMAN, District Judge:

This dispute concerns record keeping in connection with the harvesting of citrus fruits in Florida. The appellant, Adams Packing Association, Inc. (Adams), employed farm labor contractors Carlos Ramirez and Ramiro Ramirez during the 1976–77 and 1977–78 harvest seasons to provide Adams farm labor services. The farm labor contractors employed the plaintiffs, Inez Rivera, Jesus Rivera, Sr., Jesus Rivera, Jr., Emma Rivera, Hector Rivera, Ruben Hernandez and Elida Hernandez (Riveras), to perform the actual labor. Adams itself does not hire farm workers.

Appellees Riveras are seven migrant farmworkers. They brought suit in the district court against Adams, a Florida fruit processing concern, alleging numerous violations of Section 14 of the Farm Labor Contractor Registration Act (the Act), 7 U.S.C. § 2050c (1976). The parties agreed to submit the case for decision on cross-motions for summary judgment. The district court considered the motions on accompanying memoranda, documentary evidence and deposition testimony. The district court granted plaintiffs' motion, concluding that under Section 14, persons furnished migrant workers (users) by farm labor contractors (contractors) have an affirmative duty to obtain and maintain records that contain the information required to be kept by the contractor under Section 6(e) of the Act, 7 U.S.C. § 2045(e) (1976). Adams appeals the district court's determination that a user of farm labor has such an affirmative duty. We affirm.

■ Section 14 of the Act, 7 U.S.C. § 2050c (1976) provides as follows:

Any person who is furnished any migrant worker by a farm labor contractor shall

* Honorable Virgil Pittman, U.S. District Judge for the Southern District of Alabama, sitting by

designation.

maintain all payroll records required to be kept by such person under Federal law, and with respect to migrant workers paid by a farm labor contractor such person shall also obtain from the contractor and maintain records containing the information required to be provided to him by the contractor under section 2045(e) of this title.

The district court concluded, and we agree, that Section 14 must be read in conjunction with Section 6(e) of the Act, 7 U.S.C. § 2045(e) (1976), which provides in pertinent part that

He [the farm labor contractor] shall additionally provide to the person to whom any migrant worker is furnished all information and records required to be kept by such contractor under this subsection, and all information required to be provided to any migrant worker under this subsection.

Adams contends that the contractor has the exclusive responsibility for accurate record keeping. The record keeping provisions applicable to the user, it is urged, simply facilitate the policing of the Act's requirements by the Department of Labor. Adams further argues that because the Riveras were directly employed by the contractors, who were independent contractors, and because they were not hired by or supervised by Adams, Adams is not responsible for any inaccuracies.

 The Act is remedial in nature and should be given broad construction. *Soliz v. Plunkett*, 615 F.2d 272, 275 (5th Cir.1980); *Marshall v. Coastal Growers Association*, 598 F.2d 521, 525 (9th Cir.1979). Under Section 14, the user must "*obtain* from the contractor *and maintain* records *containing the information required* to be provided to him by the contractor under [Section 6(e)] . . . ." (Emphasis added). It is clear that Congress intended to place some responsibility for the obtaining and keeping of records on the user:

Section 14 . . . of the Act . . . places responsibility on the person to whom

workers are furnished by a farm labor contractor for the keeping of records, . . . .

S.REP. No. 1295, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.CODE CONG. & AD.NEWS 6441, 6451 (hereinafter S.REP.). The district court held that "[a] close reading of this portion of the statute indicates that the user has an affirmative duty to obtain and maintain payroll records, not merely in whatever form they may be submitted by the contractor, but instead, as stated in the Act, records *containing the information* required by Section 6(e) of the Act, that is, accurate payroll records." *Rivera v. Adams Packing Association*, No. 80–447, mem. op. at 4 (M.D.Fla. Nov. 17, 1981). We agree, except we would modify "accurate payroll records" to *facially* accurate payroll records. We do not think the user has a duty to conduct an audit or make an extensive investigation that the records are absolutely accurate. This construction comports with a conjunctive reading of the two relevant sections of the Act, in the light of the remedial character of the Act and the expression of congressional intent.

If the user accepts from the contractor and maintains records that (1) are obviously incomplete, i.e., do not contain information required to be kept under Section 6(e) or the regulations promulgated pursuant thereto, or (2) contain palpably erroneous information that, in the light of well-known practices of the farm labor business and/or the user's own records, could not be arguably correct, then the user has failed to comply with the plain terms of Section 14. On the other hand, if the records appear complete and legitimate, such that extrinsic evidence not within the possession or knowledge of the user[1] would be necessary to show the incompleteness or inaccuracy of the records, then the user has not failed to comply with the terms of Section 14. *See Rivera, supra,* at 4, 5.

 There is support in the legislative history for Adams' proposition that the 1974

---

1. An example of such extrinsic evidence would be the testimony of the worker or workers. Testimony of the user's own officers or employees would not be considered extrinsic.

amendments to the Act were designed to remedy the lack of authority and means with which the Department of Labor could deter and correct abuses of migrant workers by the contractor. *See* S.REP., *supra,* at 6443–44. Nothing in the legislative history or the amendments themselves, however, expresses any intent that the goals of the 1974 amendments are to be attained solely through the efforts of the Department. On the contrary, the amendments support the conclusion we reach today. Among the causes cited in the Senate Report for the pre-1974 Act's ineffective enforcement provisions was the absence of any requirement that users engage only registered contractors. S.REP., *supra,* at 6443. To remedy that situation, Section 4 of the Act was amended to require users to make a determination that contractors they employ are properly registered. *See* 7 U.S.C. § 2043(c) (1976). Further, the creation of a private cause of action, *see* 7 U.S.C. § 2050a(a) (1976), indicates that Congress intended to provide additional means of enforcing the statute. These measures, together with the imposition of record obtaining and keeping duties, demonstrate the congressional intent to place upon the users a share of the responsibility, i.e., *obtaining* from the contractor at least facially correct records *and maintaining* them.

Adams' other assignments of error are without merit. *Mitchell v. Hertzke,* 234 F.2d 183 (10th Cir.1956) merely holds that under the Fair Labor Standards Act, 29 U.S.C. §§ 201–219 (1976), a company who engages an independent contractor and did not direct the labor of the independent contractor's employees is not the "employer" of the independent contractor's employees for purposes of that act's record keeping requirements. The Act, however, differentiates between "farm labor contractors", *see* 7 U.S.C. § 2042(b) (1976), and "persons" who engage such contractors, *see, e.g.,* 7 U.S.C. §§ 2043(c), 2050c (1976), and sets forth their respective obligations.

■ Further, the fact that the deficiencies in the records of plaintiffs' employment were originally caused by the contractor cannot serve to circumvent the affirmative duty upon the user to obtain and maintain such records as we have indicated.

The district court found the following specific deficiencies in the payroll records maintained by the appellant:

1. frequent omissions of the total number of hours worked by the individual workers;

2. omission of the addresses of employees;

3. failure of the contractor to list all members of the work crew;

4. listing the earnings of five plaintiffs from the Rivera family under one or two names, and listing the earnings of Ruben and Elida Hernandez under Ruben Hernandez's name;

5. underreporting of total hours worked by plaintiffs; and

6. failure to list rent deductions from payroll records.

Adams does not contest these factual conclusions.

■ Applying the standards we announce today, the first two findings fall within the first category, i.e., the omissions of total hours worked and addresses render the records obviously incomplete. These data are required by 29 C.F.R. § 40.51(k) (1982). The user can determine from the face of the records that these required data have been omitted.

The next three deficiencies (nos. 3–5) relate to the second category, information palpably erroneous in the light of industry practices known by the user and information contained in the user's own records. Although the user could not have known that the contractors had failed to list certain members of the crew, impermissibly listed workers' earnings under other workers' names, or underreported hours, certain data in the payroll records were so glaringly erroneous that the user should have been put on notice that the contractor had committed specific Section 6(e) violations.

The records show that plaintiff Jesus Rivera earned an average of $37.60 per hour during the week ending February 17, 1977.

According to the testimony of Adams' employee, the average worker could earn about $5.00 per hour at Jesus Rivera's $.65 per-box rate. Payroll sheets for other weeks show that Jesus Rivera earned from about $15.00 to $25.00 per hour. Under the standard we find applicable, it was obvious to Adams in the light of its own knowledge of the industry that Rivera's reported earnings were erroneous.

The sixth deficiency, failure to list required rent deductions from the payroll records, also comes within the second category. The district court found that deductions for rent were sporadically listed or not reflected at all in the records. *See* 7 U.S.C. § 2045(e) (1976); 29 C.F.R. § 40.51(k) (1982). The district court found that "[a]s evidenced by [Adams'] records from a prior year and by depositions of the Defendant's employees, Adams should have been on notice of these omissions." *Rivera, supra,* mem. op. at 6.

■ The payroll records show sporadic deductions from gross wages for rent. The deposition testimony reveals that it is Adams' procedure to rent its housing units to the contractor, who in turn deducts rent from the wages of the individual workers who actually live in the rental units. Under these circumstances, it cannot be said that notations of rent deductions, although sporadic, are palpably erroneous. Under the standard we enunciate, this conclusion as to item 6 is not supported by the record, and the district court was in error. However, because civil relief is available for violation of "any provision" of the Act, 7 U.S.C. § 2050a(a) (1976), the judgment of the district court should stand.

■ The civil relief provisions of the Act, 7 U.S.C. § 2050a(a) (1976), provides as follows:

> Any person claiming to be aggrieved by the violation of any provision of this chapter or any regulation prescribed hereunder may file suit in any district court of the United States having jurisdiction of the parties without respect to the amount in controversy or without regard to the citizenship of the parties and without regard to exhaustion of any alternative administrative remedies provided herein.

We think that the district court and the Southern District of New York, *see DeLeon v. Ramirez,* 465 F.Supp. 698, 705 (S.D.N.Y. 1979), are correct in holding that the term "intentionally" as used in Section 2050a(b) refers to the standard by which a person may be held liable for the natural consequences of his or her acts. Because appellant was aware of the provisions of Section 14 at the time these glaring and obvious violations occurred, the district court properly concluded that Adams' violations of the Act were intentional.

■ Appellees sought only the statutory remedy of $500.00 per violation. 7 U.S.C. § 2050a(b) (1976). All plaintiffs except Elida Hernandez and Jesus Rivera, Jr. worked both the 1976–77 and 1977–78 harvesting seasons. Elida Hernandez worked for Carlos Ramirez during the 1976–77 season; Jesus Rivera, Jr. worked for Ramiro Ramirez during the 1977–78 season. The farm labor contractors were different each year: Carlos Ramirez was the contractor in 1976–77, Ramiro Ramirez in 1977–78. Because separate transactions occurred each of these two harvesting seasons, the district court correctly concluded that separate violations occurred each season, and correctly awarded each plaintiff $500.00 for each of the seasons he or she worked for the two contractors.

There being no reversible error, the judgment of the district court is due to be and hereby is

AFFIRMED.